IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

UNITED STATES OF AMERICA,

                            Plaintiff,

    v.                                   Criminal Action No. 3:14-CR-48

BERNARD EDWARD DIXON, JR.,

                        Defendant.

## MEMORANDUM OPINION

THIS MATTER comes before the Court on a Motion to Suppress (ECF No. 9) by Defendant Bernard Edward Dixon, Jr. ("Dixon" or "Defendant"). For the reasons stated below, the Court will DENY Dixon's Motion.

**I.    BACKGROUND**[1]

In or about March of 2014, Detective Scott Duquette, an experienced Chesterfield County Narcotics Detective, was conducting a series of investigations of Chesterfield drug dealers and their sources. In or about January and February 2014, Detective Duquette used a confidential informant to make undercover drug purchases from other drug dealers. One of the targets was a dealer identified in the affidavit ("Affidavit") as Confidential Source #1 ("CS1"), from whom the confidential informant made cocaine purchases in January and February 2014. Shortly thereafter, Detective Duquette, armed with an arrest and search warrant, approached CS1 at his/her worksite. The police found cocaine, heroin, and $356 in United States currency on CS1's person.[2]

---

[1] Defendant has proffered a different version of the facts that will be highlighted in corresponding footnotes.

[2] Detective Duquette reportedly testified at the preliminary hearing in this case that he had never seen Dixon, he had never seen Dixon sell drugs, and that he didn't know who Dixon was prior to his arrest on March 5, 2013.

Detective Duquette took CS1 into his car, where CS1 was read his/her *Miranda* rights. CS1 then said he/she wanted to cooperate. Detective Duquette then executed the search warrant for CS1's residence. At CS1's residence, Detective Duquette continued his interrogation. CS1 implicated Dixon, known to him/her as "Honey Red," as CS1's longtime suppler. CS1 provided information about Honey Red such as his nickname, race, age, and where drug transactions took place. CS1 identified the location of Honey Red's residence as 2800 Montecrest Avenue, Richmond, Virginia ("Home"). CS1 stated that Honey Red hid his drugs in the yard of the Home by a dog house. CS1 also stated that he/she purchased the drugs found on his/her person from Honey Red a short time beforehand. CS1 also reported that he/she purchased illegal drugs two to three times a week from Honey Red and that he/she had been purchasing cocaine from him for a long time.[3]

Detective Duquette placed CS1 in his vehicle so that CS1 could direct him to the Home, which CS1 did. During the ride, Detective Duquette continued to question CS1 about his drug dealing with Honey Red. Detective Duquette then drove CS1 back to his residence and released him. Later that evening, Detective Duquette obtained utility records that showed Dixon as the person residing at the Home. Detective Duquette also obtained Dixon's prior criminal record. On March 5, 2014, Detective Duquette completed his report of the arrest and release of CS1. On March 5, 2014, Detective Duquette prepared and Affidavit on the basis of CS1's information and obtained a search warrant for the Home.

The Affidavit submitted by Detective Duquette described the Home in detail and sought permission to search the residence and curtilage of the Home. The Affidavit also sought the ability to search for drugs and drug paraphernalia. The Affidavit stated:

---

[3] To protect CS1's identity, the Government opted to omit the precise amount of time CS1 has dealt with Dixon. Defendant represents however that Detective Duquette represented that CS1 purchased the cocaine from Dixon over 100 times within the last 12 months. In his post-arrest statement, CS1 reportedly stated that he has bought cocaine from "Honey Red" for the last two years. At the suppression hearing, a person by the name of Ms. Banks testified that during the four years that she has been living with Dixon, has seen him on a daily basis, shared a home with him, and has never seen him sell drugs.

On March 4, 2014, your affiant encountered Confidential Source #1 (hereby referred to as CS#1) in Chesterfield County during a search warrant. During the encounter a quantity of cocaine was discovered from CS#1. After being advised of Miranda rights, CS#1 made statements against his/her own penal interest. CS#1 stated he/she purchased cocaine from the location listed in section 2 of this document within the last 72 hours. CS#1 stated he/she has purchased cocaine from the residence described in section two of this document over 100 times within the last 12 months from a Bernard DIXON. CS#1 stated that DIXON was a light skin black male in his early 60's. CS#1 stated that DIXON has been to federal prison in the past for drug trafficking. CS#1 agreed to show your affiant where DIXON lived. CS#1 pointed out the location listed in section 2 of this document as being the residence of DIXON and the residence in which he purchases cocaine on a regular basis from DIXON. Utilities records show that Bernard DIXON has an active account at 2800 Montecrest Avenue which is the location listed in section 2 of this document

Based on CS# 1's assistance and information, your affiant was able to confirm the identity of Bernard DIXON. DIXON has a lengthy criminal history which consists of 27 pages, dating back to the 1960's. DIXON has been arrested numerous times for distribution of cocaine. DIXON has been to federal prison and has 8 felony convictions in the state of Virginia. In addition, DIXON has been arrested in several other states. DIXON was charged on 5-14-1970 of Murder in Richmond, City. CS#1 advised your affiant that DIXON has been to federal prison for selling drugs. Your affiant confirmed that DIXON had been arrested by the Drug Enforcement Agency and served time in federal prison. According to the federal bureau of prisons, DIXON was released from federal prison in April 2010.

Your affiant has independently corroborated that the information that the informant provided was true and accurate such as Bernard Dixon being incarcerated in federal prison and that Bernard Dixon resides at the 2800 Montecrest Avenue address.

(Def.'s Mot. to Suppress, Ex. 1 at 3).[4] The warrant was issued and the Home was searched on March 5, 2014.

## II.    DISCUSSION

### A. Probable Cause for the Warrant

The Fourth Amendment safeguards the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A search is *per se* unreasonable under the Fourth Amendment—with few exceptions—if it is not conducted pursuant to a valid warrant supported by probable cause. *Katz v. United States,* 389

---

[4] Defendant contends that, despite Detective Duquette's representation that he independently corroborated that the information that CS1 provided was true and accurate, there was no attempt by police to verify the allegations of criminal activity.

U.S. 347, 357 (1967). Probable cause is determined by the totality of circumstances, as seen from the point of view of "an objectively reasonable police officer." *Ornelas v. United States,* 517 U.S. 690, 696 (1996). The existence of probable cause means that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238 (1983). It does not, however, require an actual showing of criminal activity. *Id.* at 243 n.13. It is true that the wholly innocent facts cannot, alone, provide the basis for probable cause. *See United States v. Foster,* 634 F.3d 243, 248 (4th Cir. 2011). But, "'[t]he possibility of an innocent explanation does not vitiate properly established probable cause.'" *Sennett v. United States,* 667 F.3d 531, 537 (4th Cir. 2012) (internal citation omitted).

"Although the informant's veracity, reliability and basis of knowledge are relevant, they are no longer independent requirements." *Id.* (quoting *Gates,* 462 U.S. at 230). The reliability of a confidential informant may be bolstered where the Government was able to independently corroborate the confidential informant's report. *See Gates,* 462 U.S. at 244 ("[A]n informant [who] is right about some things . . . [is] more probably right about other facts."). Corroboration can come from "the police observing a substantial portion of what the informant's tip had said they would see, thereby creating a reasonable conclusion that the other information supplied by the informant—that a felony was being committed—was correct." *United States v. Miller,* 925 F.2d 695, 699 (4th Cir. 1991).

Typically, at least some independent corroboration is necessary to bolster an informant's tip and the Government's estimation of probable cause. *Id.* at 698 ("An informant's tip is rarely adequate on its own to support a finding of probable cause."). However, there is no bright-line rule as to when an informant's tip may establish probable cause, *see United States v. DeQuasie,* 373 F.3d 509, 518 (4th Cir. 2004), and there is no requirement that officers acting on an informant's tip must corroborate that tip in some specific way such as conducting an independent investigation, *Miller,* 925 F.2d at 699. "Whether subsequent corroboration is

4

necessary must be determined in the light of the totality of the circumstances presented by the particular set of facts." *DeQuasie*, 373 F.3d at 519.

Finally, in reviewing a magistrate's determination of probable cause, the court must ascertain whether there was a "substantial basis for . . . conclud[ing] that probable cause existed." *United States v. Brookins*, 345 F.3d 231, 236-38 (4th Cir. 2003). In doing so, the Court should give the magistrate's determination "great deference," and not invalidate warrants by interpreting affidavits in a hypertechnical, rather than commonsensical, manner. *Id.* at 236; *see also United States v. Gary*, 420 F. Supp. 2d 470, 476 (E.D. Va. 2006), *aff'd*, 528 F.3d 324 (4th Cir. 2008). In determining the validity of the search warrant, the Court limits itself to the four corners of the affidavits of Detective Duquette, as presented to the Magistrate. *See Gates*, 462 U.S. at 238.

### 1.    Reliability of CS1 as an Informant

Here, there is no indication that CS1 was previously known to law enforcement or had provided reliable information about other drug deals to law enforcement officers in the past. However, the Magistrate in this matter was provided enough information to be able to make a finding regarding CS1's credibility and reliability. For instance, CS1 admitted to purchasing illegal drugs from Dixon on multiple occasions. Further, CS1 stated that he had recently bought drugs from Dixon. Detective Duquette had also met face to face with CS1 because he had arrested CS1 before on drug charges. Finally, CS1's reliability is bolstered because he/she made declarations against his/her penal interests in an attempt to curry favor. *See, e.g., DeQuasie*, 373 F.3d at 523; *see also United States v. Harris*, 403 U.S. 573, 583 (1971) ("That the informant may be paid or promised a 'break' does not eliminate the residual risk and opprobrium of having admitted criminal conduct."). Further, it is evident that CS1 had some personal knowledge regarding Dixon because he was able to show Detective Duquette the Home and correctly report Dixon's age and status as a convicted felon. Thus, the foundation for CS1's knowledge was known to law enforcement prior to the execution of the warrant. *See United States v. Lalor*, 996

F.2d 1578, 1581 (4th Cir. 1993). Lastly, the Affidavit reflected Detective Duquette's professional opinion that CS1's information was accurate and reliable. In sum, CS1's report has at least some reliability and veracity.

### 2.    Independent Corroboration by the Government

The only facts that were independently corroborated by Detective Duquette were: (1) that Dixon lived at the Home, and (2) that he had previously been incarcerated in federal prison for selling illegal drugs and had been released in 2010. Despite the fact that Dixon had not been recently arrested and was released from federal prison years before the warrant was executed, Dixon's criminal history helped inform Detective Duquette of Dixon's reputation, which is relevant to probable cause. *See Harris*, 403 U.S. at 582-83; *see also Lalor*, 996 F.2d at 1581 (court found an informant's tip reliable when the police corroborated the suspect's address, vehicle, and alias, and determined that he had been arrested for drug possession just a few days before the warrant was issued, confirming his involvement in drug activity). There is no indication that the Detective made a positive identification of Dixon using any type of picture or that he even knew Dixon in any capacity prior to the tip from CS1. However, the Supreme Court has held that "[a]dmissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search." *Harris,* 403 U.S. at 583. Here, where there were sufficient facts to indicate that CS1 was a reliable informant and Detective Duquette provided at least some corroboration of CS1's tip, the Magistrate had a substantial basis on which to issue the warrant. In the alternative, the warrant will be upheld under the good-faith exception.

### B.  The Good-faith Exception

In *Leon*, the Supreme Court established the good-faith exception to the exclusionary rule holding that the "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the

purposes of the exclusionary rule," 468 U.S. at 918. There are four circumstances in which the good-faith exception does not apply:

> (1) if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) if the issuing magistrate wholly abandoned his judicial role . . .; (3) if the affidavit supporting the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;' and (4) if under the circumstances of the case the warrant is "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

*United States v. Leon*, 468 U.S. 897, 923 (1984) (internal quotation marks and citations omitted).

There is no evidence that Detective Duquette included in the Affidavit any information that he knew was false; thus, the first circumstance is inapplicable. There is also no indication that the Magistrate "abandoned his judicial role" as contemplated in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326-27 (1979) (holding that a town justice was not sufficiently neutral or detached when presented a warrant because he allowed himself to become a part of a police operation). Likewise, the fourth circumstance is inapplicable because there is little to indicate that the warrant was so facially deficient that officers could not reasonably rely on it—for example, the warrant did not fail to particularize the place to be searched or the things to be seized.

Therefore, the only viable argument is that the Affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. There is no indication, however, that Detective Duquette presented the Magistrate with a "bare bones affidavit" that could not have possibly supported probable cause. *See, e.g., United States v. Norman*, 379 F. App'x 311, 312-13 (4th Cir. 2010) (citing *United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996)). Contrary to Defendant's arguments, this is not a case were an officer relied on an anonymous informant merely giving directions to a defendant's house. *See Wilhelm*, 80 F.3d at 121. Nor is this a case where an affidavit was totally devoid of any reference to the

reliability or veracity of the informant. *See United States v. Edwards*, 798 F.2d 688 (4th Cir. 1986). Because CS1 was a known informant, who made statements against his penal interests, and there was at least some corroboration of CS1's tip in the form of confirmation of Dixon's criminal history and his presence in the Home, the Court finds that the Magistrate had before him facts he could have considered substantial and important in concluding that the Affidavit established the credibility of the informant and, thus, probable cause. *See United States v. Hurdle*, CRIM. A. No. 7:08CR00018, 2008 WL 3834081, at *3 (W.D. Va. Aug. 14, 2008) (holding that the good-faith exception applied where an informant was not anonymous and the informant's statements were against his penal interest).

### C. Franks Hearing

In *Franks,* the Supreme Court held that a defendant challenging the validity of a search warrant is entitled to a hearing if he preliminarily shows that: (1) officers knowingly or recklessly made false statements or made a statement with "reckless disregard for the truth" and (2) that the allegedly false statement or omission was material. *Id.* at 155–56, 171; *see also United States v. McKenzie-Gude*, 671 F.3d 452, 462 (4th Cir. 2011).

Dixon argues that there is at least some evidence that the Affidavit contains inaccuracies due to the fact that Dixon moved into the Home recently. Further, Dixon argues that Detective Duquette's police report contradicts the facts in the Affidavit:

> The affidavit says, 'CS#1 stated he/she has purchased cocaine from the residence described in section two of this document over 100 times within[] the last 12 months.' This statement, made under oath by Detective Duquette is contradicted by the police report that indicates that indicates that CS#1 said he was purchasing cocaine from 'Honey Red' for two years.

(Def.'s Reply 3). Dixon has not satisfied all of the requisite elements to justify a *Franks* hearing. Even if the Court were to adopt Defendant's view, the exact period of time that CS1 bought drugs from Dixon is immaterial because CS1 indicated that he had bought cocaine from Dixon recently. As such, Dixon did not meet his burden to show that a *Franks* hearing was necessary.

//

III.   **CONCLUSION**

For the reasons stated above, the Court will DENY Dixon's Motion.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order shall issue.

/s/
James R. Spencer
Senior U. S. District Judge

ENTERED this _____9th_____ day of June 2014.